**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **THIRTY AND 141, LP,** ) | |
| **GRAVOIS BLUFFS A, LLC,** ) | |
| **GRAVOIS BLUFFS I, LLC,** ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Cause No. 4:06-CV-01781-SNL** |
| ) | |
| **LOWE'S HOME CENTERS, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM**

Plaintiffs Thirty and 141, LP; Gravois Bluffs A, LLC; and Gravois Bluffs I, LLC

(hereinafter "Owner"[FN1]) originally filed a petition for reformation in Division 31 of the Circuit

Court of Saint Louis County, Missouri. Thereafter, Defendant Lowe's Home Centers, Inc.

(hereinafter "Lowes") removed the action to this Court, pursuant to 28 U.S.C. § 1441, on the

basis of diversity jurisdiction, 28 U.S.C. § 1332. This cause is currently set for trial on January

14, 2008.

> **FN1**. Each of the named plaintiffs herein is an entity primarily owned or
> controlled by Gerard J. Grewe. (Doc. #30-3 at ¶¶31-34, Def.'s Statement of
> Uncont'd Facts, filed *under seal* Aug. 17, 2007 & Doc. #45, Pls.'Response to
> Def.'s Statement of Uncont'd Facts and Pls.'Add'l Statement of Uncont'd Facts in
> Opp. at ¶¶31-34.)

During the time period relevant here, the stipulated facts demonstrate that Owner owned

and/or controlled certain real property located in Saint Louis County, Missouri; along Missouri

State Highway 141; in an area known as Gravois Bluffs. (Docs. ##30-3 & 45 at ¶9; Docs. ## 45

& 51 at ¶122 .) On June 10, 1999, Owner and Lowes entered into a Lease, whereby Lowes

would lease a portion of Owner's property for the use of a hardware/home improvement store.

(Docs. ##30-3 & 45 at ¶11; *see generally* Lease.) The Lease restricted Owner from, in relevant

part, permitting the leased property (and other surrounding lots) to be used for a hardware/ home

improvement store by Lowes' competitors. (Docs. ##30-3 & 45 at ¶12; Lease at 000022.)

Further, the Lease required Owner to subsequently record, in relevant part, deed restrictions[FN2] on

lots surrounding the leased shopping center. On August 24, 2000, Owner recorded the declaration of restrictions, Declaration 90, now in dispute. (Docs. ##30-3 & 45 at ¶2.)

> **FN2**. Although here, only the content of Declaration 90 is in dispute; ultimately, three declarations of restrictions were filed.
>
> Declarations 89 and 90 were filed August 24, 2000, and restrict Owner's platted property west of Highway 141. (Docs. ##30-3 & 45 at ¶9.) Declaration 89 restricts Lots 5-B, 5-C, 5-D, and 5-F of Gravois Bluffs Plat Three, as recorded in Plat Book 348, Pages 466 and 467 of the Recorder of Deeds of St. Louis County, Missouri. Declaration 90 restricts Lots 5-A, 6-A, 6-B, 6-C, 6-D, 6-E, 6-F, 6-G, 6-G1, 6-G2, 7, and 8 of Gravois Bluffs Plat Three, as recorded in Plat Book 348, Pages 466 and 467 of the Recorder of Deeds of St. Louis County, Missouri.
>
> On August 30, 2001, Declaration 1291 was recorded, and restricts Owner's platted property east of Highway 141. (Docs. ##30-3 & 45 at ¶9.) Declaration 1291 restricts Lots 1, 2, 3, 4, 5, 6, 7, 8, and 9 of Gravois Bluffs Plat Five, as recorded in Plat Book 348, Page 780 of the Recorder of Deeds of St. Louis County, Missouri.

In its Petition, Owner alleges that the parties agreed to restrict, record, and file deed restrictions upon only that certain real property identified in the Lease. (Doc. #1-2 at ¶¶9-11.) Owner further alleges that the property agreed upon and/or intended by the parties to be restricted is, through inadvertence and mistake, different from that embodied and identified in Declaration 90. (Doc. #1-2 at ¶¶11-15.) On that basis, Owner prays for this Court to reform Declaration 90 so as to reflect only that property identified in the Lease; and specifically, to exclude Lots 7 and 8 therefrom.

This matter is before the Court on Lowes' motion for summary judgment (Doc. #30-1, filed *under seal* Aug. 17, 2007), and Owner's cross-motion for summary judgment (Doc. #31, filed *under seal* Aug. 20, 2007). After considering the evidence and arguments propounded by both parties, the Court **HEREBY GRANTS** Lowes' motion for summary judgment; the analysis found herewith.

## SUMMARY JUDGMENT

Although summary judgment motions may be viewed as tools of "great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact," *Mt. Pleasant v. Associated Elec. Coop. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988); courts have repeatedly recognized the severity of summary judgment as a remedy, to be granted only in cases where the movant establishes his right to judgment with

such clarity so as not to give rise to controversy. *New England Mut. Life Ins. Co. v. Null*, 554 F.2d 896, 901 (8th Cir. 1977); *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976).

After the movant demonstrates the absence of any genuine issue of material fact, *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962); *Mt. Pleasant*, 838 F.2d at 273; the nonmoving party must set forth specific facts which demonstrate sufficient evidence for a potential jury verdict in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also Putnam v. Unity Health Systems, Inc.*, 348 F.3d 732, 733-34 (8th Cir. 2003) ("... the nonmoving party must 'substantiate his allegations with sufficient probative evidence ∴. based on more than mere speculation, conjecture, or fantasy.' ") (quoting *Wilson v. Int'l Bus. Mach. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)); *see also* Fed. R. Civ. P. 56(e).

In ruling on a motion for summary judgment, the court should review all facts supported by the record, and any logical inferences arising therefrom, in the light most favorable to the non-moving party. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). *See also, e.g.*, Fed. R. Civ. P. 56(e); *Robert Johnson Grain Co.*, 541 F.2d at 210 (conflicts of evidence must be construed in favor of non-movant). In that way, summary judgment should not be granted "unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir. 1998); *see also Mayer v. Nextel West Corp.*, 318 F.3d 803, 806 (8th Cir. 2003) (citing *Keathley v. Ameritech Corp.*, 187 F.3d 915, 919 (8th Cir. 1999)).


## REFORMATION

To begin, the Court notes the principles pertaining to the interpretation and construction of restrictive covenants. First, restrictive covenants are to be construed narrowly, and courts must not expand a restriction's scope of coverage beyond that which is clearly expressed. *Lake Saint Louis Community Ass'n v. Ravenwood Properties, Ltd.*, 746 S.W.2d 642, 644 (Mo.App. 1988) (citing *Berkley v. Conway Partnership,* 708 S.W.2d 225, 227 (Mo.App. 1986)). In that way, any doubt as to its meaning should be resolved against the restriction and in favor of the free use of property. *Lake Saint Louis*, 746 S.W.2d at 644 (citations omitted).

Next, in construing the terms of a restrictive covenant on realty, courts generally apply the law of contracts. *Emerald Pointe, L.L.C. v. Jonak*, 202 S.W.3d 652, 661 (Mo.App. 2006) (citing

*Big River Hills Ass'n, Inc. v. Altmann*, 747 S.W.2d 738, 742 (Mo.App. 1988)); *Hoag v. McBride & Son Inv. Co., Inc.*, 967 S.W.2d 157, 169 (Mo.App. 1998) (citing *Forst v. Bohlman*, 870 S.W.2d 442, 446 (Mo.App. 1994)); *Lake Saint Louis*, 746 S.W.2d at 644 (citations omitted).

Missouri courts have long-applied the doctrine of "merger." *Wills v. Whitlock*, 139 S.W.3d 643, 651 (Mo.App. 2004) (citing *Crowder v. Vandendeale*, 564 S.W.2d 879, 881 n. 3 (Mo. banc 1978)). Under this doctrine, once a deed is delivered and accepted as performance of an executory real estate contract, the contract is merged in the deed, and "thereafter the deed alone determines the rights of the parties." *Kelsey v. Nathey*, 869 S.W.2d 213, 217 (Mo.App. 1993) (citing *Employers Indem. Corp. v. Garrett*, 38 S.W.2d 1049, 1053 (Mo. 1931)); *see also Wills*, 139 S.W.3d at 651. Therefore, in construing the terms of a real estate contract, generally the deed, not the underlying contract, is the controlling document. *Penrod v. Henry*, 706 S.W.2d 537, 540 (Mo.App. 1986).

However, several exceptions prevent the application of merger, including that of mutual mistake. *Penrod*, 706 S.W.2d at 540 (citing *Estate of Kielhafner*, 639 S.W.2d 115, 117 (Mo.App. 1982)). The party who claims mutual mistake and seeks reformation therefrom, must show (I) a preexisting agreement; (II) a mistake; and (III) mutuality of the mistake. *Brinkerhoff Land & Livestock Co. v. Doyle*, 778 S.W.2d 336, 338 (Mo.App. 1989) (citing *Kruse v. Johnson*, 689 S.W.2d 114, 116 (Mo.App. 1985)). In cases where the mistake is shown to be strikingly clear, *Cockrell v. Pleasant Valley Baptist Church*, 762 S.W.2d 879, 880 (Mo.App. 1989) (citing *Dehner Urban Redevelopment Corp.- St. Louis v. Dun & Bradstreet, Inc.*, 567 S.W.2d 700, 704 (Mo.App. 1978)); courts are permitted to review extrinsic evidence, e.g., evidence of the parties' intent garnered from all the facts and circumstances. *Morris v. Brown*, 941 S.W.2d 835, 840 (Mo.App. 1997); *Hoffman v. Kaplan*, 875 S.W.2d 948, 951 (Mo.App. 1994); *Flaspohler*, 652 S.W.2d, 703, 709 (Mo.App. 1983); *Wills*, 139 S.W.3d 643:

> The matter of intention is seldom, if ever, capable of direct or positive proof, but is arrived at by such just and reasonable deductions from the acts and facts proven. Intent is an emotion or operation of the mind, and can usually be shown only by acts, declarations, and circumstances known to the party charged with the intent. The intent of a person cannot be proven by direct and positive evidence. It is a question of fact, to be proven, like any other fact, by acts, conduct, and circumstances. The intent with which an act is done denotes a state of the mind, and it can be proved only from expressions, or conduct, or both, considered in the light of the given circumstances. *Id*. at at 653-54 (quoting *Edie v. Coleman*, 141 S.W.2d 238 (Mo.App. 1940)).

Even at the summary judgment stage, *Anderson v. Liberty Lobby*, 477 U.S. 242, 254-55; the elements of reformation; i.e. prior agreement, mistake, mutuality; must be proven by clear, cogent, and convincing evidence.[FN3] *Cox v. Cox*, 725 S.W.2d 880, 882 (Mo.App. 1987); *see also Dehner*, 567 S.W.2d at 704 (citing *Brewer v. Blanton*, 555 S.W.2d 381, 385 (Mo.App. 1977)).

> **FN3.** Although some courts have used the "reasonable doubt" language, the burden of proof in a reformation action is measured by the clear, cogent, and convincing standard. *Flaspohler*, 652 S.W.2d at 708 (" 'Nor does the term *reasonable doubt* have any place in civil case instructions.' ") (quoting *Brooks v. Roberts, et al.*, 281 Mo. 551, 561 (Mo. banc 1920)).

With these principles in mind, the Court turns to the instant matter.

## ANALYSIS

In assessing whether reformation is proper, the Court must turn to the parties' intent. Given the clear, cogent, and convincing standard for reformation, the parties' intent must be proven by evidence "entirely exact and satisfactory." *Brinkerhoff*, 778 S.W.2d at 338 (citing *Morrison v. Jack Simpson Contractor, Inc.*, 748 S.W.2d 716, 717 (Mo.App. 1988)); *Elton v. Davis*, 123 S.W.3d 205, 212 (Mo.App. 2003). *See, e.g.*, *Niemeyer v. Stephens*, 515 S.W.2d 65, 66 (Mo.App. 1974); *Brinkerhoff*, 778 S.W.2d at 339 (The trial judge is in the best position to test the credibility of witnesses, and may reject even uncontradicted testimony.) (citing *Terre Du Lac, Inc. v. Fuhrmeister*, 753 S.W.2d 4, 5 (Mo.App. 1988)); *Brinkerhoff*, 778 S.W.2d at 338 (In according weight to witness testimony, the judge may properly consider the witness's interest in the outcome of the litigation, or a witness's uncertain or equivocal nature.); *Cox*, 725 S.W.2d at 882 (Witness testimony was deemed significant where it was adverse to the declarant's pecuniary interests); *Brinkerhoff*, 778 S.W.2d at 338 (A party's failure to produce the testimony of preparers and/or drafters of the deed permits an unfavorable inference.) (citing *Edwards v. Zahner*, 395 S.W.2d 185, 191 (Mo. 1965)).

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Lowes moves for summary judgment, alleging that Owner failed to meet its burden of proving; by clear, cogent, and convincing evidence; "(i) that Declaration 90 was the result of mutual mistake, (ii) that there was an applicable prior agreement between the parties different from what was embodied in Declaration 90, (iii) that there was a meeting of the minds on the

supposed prior agreement, or (iv) the specifics of the supposed prior agreement." (Doc. #30-1 at ¶2.)

### I. *Pre-Existing Agreement*

First, a party seeking reformation must prove; by clear, cogent, and convincing evidence; a pre-existing agreement between the parties. *Morris*, 941 S.W.2d at 839 (citing *Wates v. Joerger*, 907 S.W.2d 294, 296 (Mo. App. 1995)). Missouri courts have reasoned that the existence of a prior agreement is an inquiry of substance over form. *Morris*, 941 S.W.2d at 841-42 (the deed need not contain particular language of the parties' agreement) (citing *Bollinger v. Sigman*, 520 S.W.2d 710, 712 (Mo. App. 1975)). *See also Morris*, 941 S.W.2d at 841-42 (absent a formal agreement " 'it is sufficient that the parties agreed to accomplish a particular object by the instrument to be executed...' ") (quoting *Flaspohler*, 652 S.W.2d at 709); *accord Duenke*, 801 S.W.2d at 765 (citing *King v. Riley,* 498 S.W.2d 564, 566 (Mo. 1973)).

Here, Lowes argues that Owner has failed to prove the existence of a prior agreement, the content of that agreement, or that the "supposed" agreement differs from the language contained in Declaration 90. (Doc. #30-1 at ¶2.) In order to defeat summary judgment, Owner must prove; by clear, cogent, and convincing evidence; that the parties intended to restrict only certain property specified in the Lease, and specifically intended to exclude the property now platted as Lots 7 and 8.[FN4] *See Flaspohler*, 652 S.W.2d at 709.

> **FN4.** Owner asks the Court to reform Declaration 90 to include only the properties identified in the lease, and to exclude the inadvertently restricted properties from Declaration 90, i.e. Lots 7 and 8. (Doc. #1-2: 4.) *See Morris*, 941 S.W.2d at 839 (the prior agreement must be consistent with the change sought).

### (a) **The Lease**

The Court first turns to the negotiation, drafting, and signing of the Lease as evidence of the parties' pre-existing agreement. Lowes disputes the existence of any prior intent and/or agreement to (i) restrict only certain property specified in the Lease, and/or (ii) exclude the property now platted as Lots 7 and 8. Rather, Lowes argues that the Lease *conceptually* describes property to be later specified and restricted by the declarations. (Doc. #30-2: 12, 20.) In support of its argument, Lowes cites witness testimony and the Lease provisions.

Specifically, Beekman[FN5] testified that the language used in the Lease was intended to refer to a general concept, and the parties were expected to work together, as required by the

Lease, to reach an agreement on how to properly implement that general concept. (Beekman Dep.) Further, Lowes agreed to the Lease language because it understood, "[Owner] was either working to acquire or had already acquired and was working to configure or construct other portions of the Gravois Bluffs development. ∴ [I]t was a very general stated intention, very general concept at the time."[FN6]

**FN5**. Beekman served as outside counsel to Lowes and participated in the negotiation and review of the Lease, and the drafting of Declaration 90. Additionally on behalf of Lowes, in the negotiation and review of the Lease, was Smithey (Lowes' real estate manager), Barnes (Lowes' in-house counsel), and Reby (Lowes' outside counsel). (Docs. ## 30-3 & 45 at ¶¶41, 42, 43, 45.)

Although Owner alleges that Beekman was not involved with the negotiation of the Lease (Doc. # 45 at ¶45), the record would not permit such a finding. (*See, e.g.*, Beekman Dep.; Beekman Dec. at ¶5, 7, 10; Doc. #37 exs. G, Reby Letter, Oct. 21, 1998, & H, Reby Letter, May 5, 1999; Doc. #30-3 ex. 32, Beekman Letter, June 7, 1999; Doc. #45 ex. HH, Beekman Letter, Nov. 19, 1999).

**FN6**. *See also* Reby Dep. (The parties intended to restrict the "entire project," inclusive of "all the ground that was owned by ∴ [Owner]" at the time Declaration 90 was filed, and constituted many more acres of ground... as part of a giant overall development." Further, during the Lease negotiations, the relevant property was "amorphous and sort of undefined ∴ it was never clear what the project was going to end up being. ∴ It was talk. It was an idea. It was a concept."); *accord* Barnes Dep.

Additionally, Smithey (*supra* note 5) testified that the Lease language was "the only description we had for that portion of the property" because at the time the Lease was executed, Owner had not acquired and/or platted all of the relevant property, and the parties had agreed to later identify the property in the declarations of restrictions.[FN7]

**FN7**. *Accord, e.g.*, Reby Dep.; Barnes Dep. (Although the language used in the Lease was "unartful," the parties intended to restrict all of Owner's property.); Beekman Dep. (Beekman assumed no one at Lowes knew the extent of Owner's property "given that the lease itself says that [Owner] didn't even own the property that we were leasing[,] ∴ we did not have a specific understanding of exactly what property would be included in those or subject to those declarations of restrictions."); Doc. #45 ex. HH (After the Lease execution, Beekman wrote to Cushing, "With respect to the other proposed shopping centers abutting Highway 141, you told me that [Owner] had not yet acquired the ground on the west side of Highway 141 and has not submitted a plat for the proposed centers, and therefore will not be in a position to record a deed restriction on the subject ground in the near future."); *contra* Doc. #30-3 ex. 21, Cushing Letter, Nov. 24, 1999 ("Just to clarify your November 19, 1999 correspondence, I wish to point out that [Owner] has acquired the property on the west side of Highway 141, but that property has not been platted.").

Even assuming Lot 7 was owned by Owner at the time the Lease was executed (Appelbaum Dep.), Lowes' uncertainty as to what Owner owned and/or controlled during the Lease signing is supported by the record. Therefore, the Court does not find clear, cogent, and convincing evidence that "other proposed shopping centers abutting Highway 141" did not refer to property other than that described in E-2.

In response to Lowes' argument, Owner disputes the parties' intent to conceptually describe the property; rather alleging that Declaration 90 was meant only to "memorialize "the restrictions as agreed to by the parties and set forth in the Lease, the Lease specifically identifies [by legal description or reference] what property is to be restricted," and that property does not include Lots 7 and 8. (Docs. ## 44: 2 and 45 at ¶19.) Specifically, Owner alleges: (i) the Lease only describes the "south," "north," and "east" shopping centers, which were intended to be restricted (Gary Grewe Dep.); (ii) Exhibit E-2 contains a meets and bounds legal description of the property west of Highway 141, which the parties' intended to restrict (Gary Grewe Dep.); and (iii) the Lease provides for restrictions on the "proposed shopping centers abutting Highway 141," and Lots 7 and 8 were not within the scope of that description (Gary Grewe Dep.).

In response to Owner's position, Lowes argues that the Lease language expresses a conceptual agreement and the parties did not agree to restrict specific parcels of land, in that Lowes was uncertain about what property Owner owned and/or controlled, and for what purpose such property would ultimately be used. (Doc. #30-3 at ¶¶10, 16, 19; Doc. #51 at ¶¶142-43.) Therefore, Lowes claims that the conceptual language contained in the Lease referenced the property later platted as Lots 7 and 8. (Doc. #51 at ¶¶136, 143.)

In looking at the one-hundred-and-three-page Lease, the Court agrees with Owner in that the parties "spent months hammering out" a very lengthy, specific, unique-to-the-parties agreement. However, the evidence before the Court is insufficient to support a finding that the parties agreed on "very precise language" about the geographical scope of those restrictions, and/or specifically intended to exclude the property later platted as Lots 7 and 8 from subsequent restriction.[FN8]

> **FN8**. This proposition is further muddied by the deposition testimony of Owner's representatives, who testified that the parties had never discussed whether or not to restrict the property later platted as Lots 7 and 8. (Gary Grewe Dep.; Cushing Dep.; *see also* Docs. ##30-3 & 45 at ¶18.)

In reviewing the evidence, the Court finds a pre-existing agreement to restrict certain properties. (Docs. ## 45 & 51 at ¶¶136, 142-43.) Further, the Lease required the parties to have reached agreement as to the restricted property. *See*, *e.g.*, Lease § 1(a)(xix)(H) at 000007 ("[Owner and Lowes] shall have agreed upon a Declaration of Easements, Covenants, and Restrictions ('the REA'), which REA shall have been recorded in the Office of the Recorder of Deeds for St. Louis, Missouri."); Doc. #30-2: 3 ("One of the contingencies in the Lease required [Owner] to record declarations in favor of [Lowes] to prohibit competitive uses, declarations [Lowes] had the right to approve."). However, for the reasons outlined below, Owner has not sufficiently established that the negotiation, drafting, and signing of the Lease is evidence of a prior agreement contrary to that embodied in Declaration 90.

### i. Section V

The Lease required Owner to record the restrictions on, in relevant part, "each of the proposed shopping centers abutting Highway 141 setting forth a 'no home improvement store' restriction all as more specifically set forth on Exhibit E-2." (Lease §5 at 000022.) Owner claims that the reference to E-2 was intended to "further define those [proposed shopping centers abutting Highway 141]." (Doc. #44: 7; Cushing Dep.) Lowes counters, that the language, "all as more specifically set forth on Exhibit E-2," existed in the Lease drafts before the metes and bounds description of the "South" shopping center was added to E-2[FN9]. (Docs. ## 30-3 & 45 at ¶¶106, 108.) Therefore, Lowes alleges, at the time the Lease was negotiated and signed, it interpreted this language to expand upon the types of use restrictions, rather than their geographic scope. In order to determine whether the parties intended for E-2 to exclusively define the "Proposed Shopping Centers Abutting Highway 141," the Court turns to the four corners.

> **FN9**. Although this point is stipulated, Lowes' evidentiary support relies solely on drafted excerpts of, or references to, Section 26 of the Lease, which pertains exclusively to the Lowes Shopping Center.

### ii. Exhibit E-2

Exhibit E-2, entitled "Legal Description of and Use Restrictions for the Proposed Shopping Centers Abutting Highway 141," identifies and applies the use restrictions, stating, "No portion of the property may be used for ∴ [restricted purposes]." (Lease ex. E-2 at 000075.) In addition to the "Proposed Shopping Centers Abutting Highway 141," E-2 extends the use

restrictions to the "proposed shopping center abutting the *east* side of Highway 141." (*Id*. (emphasis added).) Additionally, E-2 contains a metes and bounds legal description of the "Lease Area Shopping Center 'South.' "[FN10] (*Id*. at 000076.)

> **FN10**. The parties stipulate that the metes and bounds description in E-2 describes only that property later platted as Lot 6 and its subdivisions. However, the parties are not in agreement apropos the intended meaning of "south" and/or "adjacent" used throughout the parties' dealings and conversations. Specifically, while Owner alleges that the terms were used by the parties to describe only the property legally described in E-2 (Doc. #45 at ¶¶115, 125-26; Cushing Dep.; Doc 45 at ¶¶150-152); Lowes alleges that the terms described property inclusive of the property later platted as Lots 6, 7, and 8 (Doc #30-3 at ¶115; Beekman Dep.; Doc. #51 at ¶¶125-26, 150-52).

The Court finds instructive that the language used to describe the "abutting" property in E-2 is contrary to the language used in Exhibit E-1 to restrict the Lowes' Shopping Center. Specifically, E-1 restricts the defined terms, "Shopping Center"[FN11] including the "Premises."[FN12] (Lease ex. E-1 at 000073-000074.) In addition to its lease definition, "Shopping Center" is further described using a site plan (Lease ex. A at 000058- 000059, ex. L at 000101) and a metes and bounds legal description (Lease ex. B at 000060).

> **FN11**. "Shopping Center" was defined in the Lease to mean, in relevant part: "the commercial development described upon the attached overall shopping center site plan labeled Exhibit L, attached hereto and made apart hereof (the "Shopping Center Site Plan") and shall include all of the Common Areas and Common Facilities described on the Shopping Center Site Plan..." (Lease §1(a)(xx) at 000007.)

> **FN12**. The use restrictions in E-1 generally applied to the defined terms "Shopping Center" and "Premises." Additional use restrictions applied to the "Shopping Center" excluding the "Premises," but inclusive of "any other property owned by [Owner] lying on the west side of Highway 141 shown as outlined in purple on the Site Plan." (Lease ex. E-1 at 000073-000074.)

Given the specificity of the Lease and the language employed therein, the Court is puzzled with the parties' choice of language[FN13] with respect to the use restrictions now at issue. Be that as it may, the Court will give effect to the plain meaning of the Lease language. *See* Doc. #44: 6 (" 'A valid contract cannot be found based on the secret intentions of one of the parties, but must rely on the objective outward acts of both parties involved.' ∴ one party to a contract cannot change the terms by 'forming a contrary subjective intent' and 'crossing his fingers.' ") (quoting *Walker v. Rogers*, 182 S.W.3d 761, 769 (Mo.App. 2003*) and McKee v.*

*Constr. Co. v. Stanley Plumbing and Heating Co.*, 828 S.W.2d 700, 706 (Mo.App. 1992)).  *See also Trapp v. Barley*, 897 S.W.2d 159, 165 (Mo.App. 1995) (" 'No implied provision can be inserted ∴ to supply a covenant upon which it was intentionally silent.' ")  (quoting *Conservative Federal Savings and Loan Association v. Warnecke*, 324 S.W.2d 471, 478-79 (Mo.App. 1959)).

> **FN13**.  Owner's counsel testified that the Lease language was prepared by the surveying/engineering company hired by Owner.  (Cushing Dep.)

The Court finds the parties' language in their correspondence and in the Lease does not objectively manifest an intent to restrict property exclusive of Lots 7 and 8.  First, contrary to the language used in E-2 to restrict the "abutting" shopping centers, the language used to restrict the Lowes Shopping Center was specific and limited.  To wit, where E-1 stated "*...no portion of the Shopping Center, including the Premises*, shall be used [for restricted purposes]," Exhibit E-2 read, "*No portion of the property* may be used for ∴ [restricted purposes]."  (Emphasis added.)  Additionally, the parties chose (i) not to define the "Proposed Shopping Centers Abutting Highway 141" with the same particularity as the Lowes "Shopping Center" (Lease; Doc. #51 at ¶¶122, 125); and (ii) not to objectively limit the scope of the use restrictions *exclusively* to the proposed east side shopping centers, and/or the metes and bounds legal description of the "South" shopping center attached thereto.  Therefore, the only language instructional to the Court is found in E-2's title: "Proposed Shopping Centers Abutting Highway 141."

The parties stipulate that the Lease could not, and did not, describe all of the property to be restricted.  (Docs. ##30-3 & 45 at ¶¶14-15; Grewe Dep.; Lease.)  Expressly, at the time the Lease was negotiated and signed, all of the east side property, which was properly restricted thereafter, was not capable of being legally described, and/or under Owner's ownership and/or control.  (*Id.*)  Due to this lack of information and certainty, the parties intended and agreed to restrict all the property on the east side.  However, contrary to its alleged intent with respect to the west side property, Owner argues that E-2's reference to the "proposed shopping center abutting the east side of Highway 141" indicates the parties' intent to specifically restrict all property east of Highway 141.  (Docs. ##30-3 & 45 at ¶15.)  By the clear, cogent, and convincing standard; the Court cannot reconcile this claim with Owner's allegation that the parties

*necessarily* did not intend "Proposed Shopping Centers Abutting Highway 141"; which admittedly described property west of Highway 141, *at least in part*; to include *all* of Owner's west side property.[FN14]

> **FN14**.  Owner argues that it is unreasonable to find that the parties intended to restrict all the west side property in that there would have been no reason to wait for the property to be platted.  (Cushing Dep.; Doc # 45 at 17 & 28.)  The Court finds this argument to be without merit.
>
> Cushing testified that the legal description for the east side shopping center was unknown at the time of the Lease because Owner had not yet acquired and/or platted all of the property, and could not therefore ascertain the exact location of the proposed tenants.  (Cushing Dep.)  However, Cushing further testified that, at the time of the Lease negotiation, "a legal description could have been obtained as to the east side."  (Doc. #51 at 127; Cushing Dep.)  In any case, once the property was platted, Declaration 1291 (*supra* note 2) effectively restricted all property east of Highway 141 then under Owner's ownership and/or control.  (Cushing Dep.)
>
> Although Cushing testified that, unlike the west side property, the parties intended and agreed to restrict all of the property on the east side which was "a part of a shopping center" (Cushing Dep.; Gary Grewe Dep.); the Court holds that the same reason which served to restrict all property lying on the east side of Highway 141, will not be found inapplicable and/or counterintuitive as applied to the west side.

Also of note, in addition to the lease definition and legal description of "Shopping Center" Section 1(b) provides:

The following additional terms are defined in the Paragraphs and/or defined on the Exhibits of this Lease noted below: ∴.

| "Common Areas" | Paragraph 1(a)(xx) and Exhibit A |
| "Common Facilities" | Paragraph 1(a)(xx) and Exhibit A |
| "Common Parking Areas" | Exhibit A |
| "Primary Parking Area" | Paragraph 1(a)(xx) and Exhibit A |
| "Shopping Center Site Plan" | Paragraph 1(a)(xx) and Exhibit L |
| "Site Plan" | Paragraph 1(a)(viii) and Exhibit A |

(Lease §1(b) at 000008-000010.)

Given the parties' specificity as regards certain other property covered by the Lease, the Court does not find the evidence to be clear, cogent, and convincing that the parties

intended, with regard to the west side property, to restrict only that which was legally described in E-2.

In light of the whole record and for the reasons stated above, the Court finds insufficient evidence to support a finding that the parties intended, as evidenced by the Lease, to specifically exclude Lots 7 and 8 from the use restrictions.[FN15] The Lease was carefully negotiated to include the specific terms selected by the parties, expressly dealt with property subject to use restrictions, and did not provide specific legal descriptions for all the property intended for restriction, and/or objectively confine the restrictions to the legal descriptions contained therein. *See Mark Andy, Inc. v. Hartford Fire Insurance Company*, 229 F.3d 710, 717 (8th Cir. 2000), *aff'd on other grounds*, 233 F.3d 1090 (8th Cir. 2000) ("Without an objective manifestation of intent at the time the contract was formed, it cannot be said that the parties had a definite and explicit agreement"; and without which " 'there is no mutual agreement that a reformation could express.' ") (quoting *Continential Ins. Co. v. Cotten*, 427 F.2d 48, 53 (9th Cir. 1970)). On that basis, the Court will not further infer the parties' subjective intent. *See, e.g.*, *Conservative Federal Sav. and Loan Ass'n v. Warnecke*, 324 S.W.2d 471 (Mo.App. 1959).

> Implied obligations must rest entirely upon the presumed intention of the parties, as gathered from the terms actually expressed in the writing itself; and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to expressly stipulate with reference thereto, or it must appear that it is necessary to infer such an obligation to effectuate the full purpose of the contract. It is not enough to say that the implied covenant is necessary to make the agreement fair, or that without such covenant it would be improvident or unwise, or that the contract will operate unjustly. *Id.* at 478-79.

*Crestwood Plaza, Inc. v. Kroger Co.*, 520 S.W.2d 93 (Mo.App. 1974):

> [The parties] negotiated their lease deliberately, thoughtfully and extensively... We therefore consider the matter of restrictions to have been discussed and the parties' intentions to have been incorporated into the contract. *Id.* at 98 (citing *Glass v. Mancuso*, 444 S.W.2d 467 (Mo. 1969)).

> **FN15**. The inconclusiveness of the restricted property is further supported by Section Five, which allows for Lowes to approve the wording of the deed restrictions, stating: "...[Lowes] shall have the right to approve the wording of the deed restrictions." (Lease at 000022.) *But see* Doc. #45 at ¶50 (Owner alleges that "[Lowes] could not make changes to the scope of Declaration 90, as the scope of the Restrictions were provided in the Lease.").

### (b) **Declaration 90**

Next, the Court turns to the negotiation, drafting, and recording of Declaration 90 as evidence of a pre-existing agreement between the parties.

Owner first cites the language used in Declaration 90 to prove the existence of a prior agreement. Namely, Declaration 90 states: "under the terms of the Lease, [Owner] has granted Lowe's certain exclusive rights and privileges and use restrictions in the Restricted Property as described herein and is required to record this Declaration against the Restricted Property." However, for the reasons stated; coupled with the absence of (I) a Lease definition of "Restricted Property," or (II) a Lease reference to the "lots" identified in Declaration 90; Owner has not met its burden of establishing a prior agreement.

Next, Owner refers to the parties' language subsequent to the Lease. In accord with the preceding analysis, the Court finds that the parties' language does not amount to clear, cogent, and convincing evidence of a prior agreement. Specifically, the parties' references, to (i) "each of the other proposed shopping centers abutting Highway 141" (Doc. #45 ex. HH, Doc. #30-3 ex. 21); (ii) the "adjacent shopping center being developed by your client" (Beekman Letter, Apr. 25, 2000; Cushing Letter, July 28, 2000); and/or (iii) "South and North Shopping Centers" (Bertel Letter Aug. 10, 2000; Beekman Letter, Aug. 11, 2000), do not sufficiently establish the existence of any prior agreement contrary to that embodied in Declaration 90. *See supra*.

Having found the absence of a pre-existing agreement between the parties, the Court must accordingly grant Lowes' motion for summary judgment. *See*, *e.g.*, *Morris v. Brown*, 941 S.W.2d 835, 842-841 (Mo.App. 1997) (citing *Everhart v. Westmoreland*, 898 S.W.2d 634, 637 (Mo. App. 1995)); *Dougherty v. Dougherty*, 102 S.W. 1099, 1101 (Mo. 1907) (To grant a petition for reformation, "... the preceding agreement must *ex necessitate* be shown.") (emphasis added); *Morris*, 941 S.W2d at 840-42 (Court reversed grant of reformation to title certain real property as a joint tenancy, finding insufficient evidence from which a trial court could have found an implied agreement; where the parties had not discussed how the property would be titled, and the evidence did not establish that grantor intended to so title the property at the time of his conveyance.).

## II. *Mistake* & III. *Mutality*

Assuming, for purposes of argument and comprehensiveness, that Owner had proven a pre-existing agreement; Owner must next demonstrate mutual mistake.[FN16] *Morris*, 941 S.W.2d at 839 (Mo.App. 1997) (citing *Wates v. Joerger*, 907 S.W.2d 294, 296 (Mo. App. 1995)). *See Dehner*, 567 S.W2d at 704 ("it must appear that both parties have done what neither party intended.") (citing *Grossman Wrecking Co. v. Bituminous Casualty Corp.*, 518 S.W.2d 719, 725 (Mo.App. 1974)). To constitute grounds for reformation, the mutual mistake must be one which is made in reducing the pre-existing agreement to writing, resulting from (i) a "scrivenor's error," so long as the scrivenor acted on behalf of both parties; or (ii) a shared misconception regarding a fact or assumption upon which they based their bargain. *Husch & Eppenberger, LLC v. Eisenberg*, 213 S.W.3d 124, 134 (Mo.App. 2006).

> **FN16**. In the context of equitable remedies, a mistake is described as an erroneous understanding or conviction "which influences the will and leads to some outward physical manifestation." 2 JOHN NORTON POMEROY, JR., A TREATISE ON EQUITY JURISPRUDENCE at §839 (2d ed. 1918). In that way, a mistake requires ignorance, and is distinguished from fraudulent misrepresentations or concealments, which infer knowledge and intent; and inattention or absence of thought, which are inherent in negligence. *Id*.

Owner alleges that the second class of mistakes is relevant here; wherein, during the drafting of Declaration 90, both parties misunderstood or were entirely ignorant of some term or provision, so that there was never a meeting of the minds in reducing the prior agreement to the writing. *See* 2 POMEROY, *infra* note 18, at §853. Here, if mutual mistake is established, courts may review parol evidence to establish mistake and in what it consisted, and to show how the writing should be reformed to conform to the parties' intentions and underlying agreement. *Duenke*, 801 S.W.2d at 765-66 (citing *State ex rel. State Highway Commission v. Schwabe*, 335 S.W.2d 15, 19 (Mo. 1960)). *But see Dehner*, 567 S.W.2d at 704 (intent of the parties should not be considered where a contract is free from ambiguity); *disagreed with in relevant part by*, *CMI Food Service, Inc. v. Hatridge Leasing*, 890 S.W.2d 420, 422 (Mo.App. 1995).

> "... the very nature of a reformation action is such that it is outside the field of operation of the parol evidence rule. Parol or extrinsic evidence is not received for the purpose of varying the contract of the parties but to show what their contract really was. The thing being reformed is the writing, not the contract." *Duenke*, 801 S.W.2d at 766.

In its motion for summary judgment, Lowes alleges absence of mistake in that Owner (i) had "ample" opportunity to (and its attorneys did in fact) review and revise Declaration 90, and to compare Plat 3 with the lots listed therein; (iii) never deleted Lots 7 and 8 from Declaration 90's coverage; and (iv) signed Declaration 90 for recordation. (Doc. #30-1 at ¶12.c-g & 14.b.(v).) Lowes further states that two of Owner's attorneys negotiated, reviewed, and edited several drafts before Declaration 90 was signed by Owner and recorded. (Doc. #30-2: 2.) In support of its position, Lowes points to the parties' written communications and the testimony of Owner's attorneys who reviewed and edited Declaration 90.

Specifically, in April of 2000, Cushing[FN17] sent Beekman a copy of the recorded Gravois Bluffs Amended Plat Two, covering the property now at issue. (Haddock Letter, Apr. 10, 2000.) Amended Plat Two depicted the platted property, including Lots 7 and 8. A couple of weeks later, Beekman sent Cushing proposed drafts of Declarations 89 and 90 "to be recorded on [the shopping center where the Lowes store is located] and the adjacent shopping center being developed by your client." (Beekman Letter, Apr. 25, 2000.) The letter further instructed Owner to "double check the legal descriptions on each document to make sure the documents will be filed against the appropriate properties in accordance with the terms of the Lease." (*Id*.) The letter was copied to Smithey and Barnes, and the proposed draft included Lots 7 and 8 in the "Legal Description." (*Id*.)

> **FN17**. On behalf of Owner, Cushing (Owner's outside counsel) and Gary Grewe (Owner's Real Estate Salesman) were the only persons who participated in the negotiation of the Lease. (Docs. # 30-3 & 45 at ¶40; Cushing Dep.; Gary Grewe Dep.)

On June 30, Bertel wrote Beekman and advised that a new plat, Gravois Bluffs Plat Three (hereinafter "Plat 3"), was being recorded covering the lots to be listed in Declaration 90. (Doc. #30-3 ex. 25, Bertel Letter, June 30, 2000.) On July 28, 2000, Cushing sent Beekman "The Declaration of Restrictions for the Lowe's shopping center and the Adjacent Shopping Center marked to show our proposed changes." (Cushing Letter, July 28, 2000.) Gary Grewe was copied on the communication, and Cushing did not address or change Declaration 90's "Legal Description," which included Lots 7 and 8. (*Id*.)

On August 7, 2000, Beekman sent Bertel the proposed blacklined draft, which included, in pertinent part, the following "Legal Description":

> Lots 6-A, 6-B, 6-C, 6-D, 6-E, 6-F, 6-G, 7 and 8 of an ~~Amended and Restated Plat of~~ Gravois Bluffs Plat Two <u>- Amended Plat</u> as recorded in Plat Book ~~347~~ <u>348</u> Pages ~~770~~ <u>165</u> & ~~771~~ <u>661</u> of the St. Louis County, Missouri records.  (Beekman Letter, Aug. 7, 2000.)

On August 10, 2000, Bertel sent Beekman the proposed blacklined draft containing additional proposed changes, including, in pertinent part:

> Lots 6-A, 6-B, 6-C, 6-D, 6-E, 6-F, <u>6-G1</u>, <u>6-G2</u>, 7 and 8 of an ~~Amended and Restated Plat of~~ Gravois Bluffs Plat ~~Two~~ <u>Three</u> ~~- Amended Plat~~ as recorded in Plat Book ~~347~~ <u>348</u> Pages ~~770~~ ~~165~~ <u>466</u> & ~~771~~ ~~661~~ <u>467</u> of the St. Louis County, Missouri records.  (Bertel Letter, Aug. 10, 2000) (Court's illustration.)

On August 11, 2000, Beekman sent Bertel (and copied Barnes, Smithey, and Reby) the final proposed  blacklined draft, which provided:

> Lots 6-A, 6-B, 6-C, 6-D, 6-E, 6-F, 6-G, 6-G1, 6-G2, 7 and 8 of Gravois Bluffs Plat Three as recorded in Plat Book 348 Pages 466 & 467 of the St. Louis County, Missouri records.  (Beekman Letter, Aug. 11, 2000.)

The Court is skeptical that the inclusion of Lots 7 and 8 was caused, at least in part, by the inadvertence or mistake of Owner.  First, Declaration 90 was drafted by Lowes and the legal description attached to Declaration 90 was a two and one-half sentence list of lots to be restricted.  Further, the whole purpose of Declaration 90 was to restrict the use of that property listed on the attachments thereto.  The Court is not persuaded by Owner's allegation that no interested party working on its behalf (other than the drafting attorney who had little familiarity with reading plats and the transaction at issue) ensured that the correct property was listed on the attachments, and therefore subject to restriction.[FN18]  (Doc. #44: 10.)  *See Landmark*, 784 F.Supp. at 1440 (failure to read the contract is negligence) (citing *Sanger v. Yellow Cab Co.*, 486 S.W.2d 477, 481 (Mo. 1972)).  However, if Owner establishes its mistake, this Court finds in accord with Missouri courts that, its failure to review the lots included in Declaration 90 will not operate as a bar to reformation.  *See Sparks*, 388 S.W.2d at 518 ("The books are full of such cases.").[FN19]

**FN18**.  It is stipulated that Owner "claimed to be concerned about the extent of use restrictions on the property in which they have an interest," and Owner alleges that it would not have entertained restricting Lots 7 and 8.  (Docs. ##30-3 & 45 at ¶¶38.)  However, in spite of this concern, Owner's representatives did not review (or remember reviewing) the list of lots to be restricted by Declaration 90.  (Docs. ##30-3 & 45 at ¶¶52-55, 71.)

**FN19**. *See Kemna v. Graver*, 630 S.W.2d 160 (Mo.App. 1982). Missouri courts observe the rule that "neglect does not give rise to negligence which may bar reformation of an instrument unless the act of neglect violates a positive legal duty owed defendant by plaintiff; and there is no authority which imposes a legal duty, on the part of plaintiff as grantor to defendant as grantee, to ascertain the legal significance of the language contained in a deed. *Id*. at 161.

Further, even if plaintiff is found to be negligent, reformation will still not be barred unless the negligence is found to have prejudiced the other party. *Kemna*, 630 S.W.2d at 161 (citing 3 JOHN NORTON POMEROY, JR., A TREATISE ON EQUITY JURISPRUDENCE at §856 at 341 (5th ed. 1941)). *See also Moreland v. State Farm Fire and Cas. Co.*, 662 S.W.2d 556, 563 (where defendant has not changed position in reliance, plaintiff's negligence will not bar reformation even where she supplies the wrong description or fails to detect the erroneous description.).

Here, Lowes claims that it would not have entered into the Lease if it would not have been able to restrict the Lots later platted as 7 and 8. However, if the Court finds, by clear, cogent, and convincing evidence, that the parties intended and/or agreed for the same property to be free from restriction, then Lowes' point is moot.

Cushing testified that, in drafting Declaration 90, he reviewed, and made comments and changes to, the correspondence exchanged by the parties. (Cushing Dep.) However, Cushing could not recall whether he reviewed the "legal description" of the declarations' drafts or Bertel's handwritten changes thereto. (*Id*.)

Cushing further testified that, although he did not know whether Lowes intended to include Lots 7 and 8 within Declaration 90, Declaration 90 was not an accurate reflection of the parties' intent and agreement, in that those lots were never requested to be covered or "included as part of the property restricted by Lowe's," and should have been deleted from Declaration 90. (Cushing Dep.) "I can't imagine that Lowe's would have intended to get something they never asked for." (*Id*.)

Bertel testified that, prior to the recordation of Declaration 90, he compared and made changes to the declaration drafts to conform them to Plat 3; however, Bertel never modified or deleted the inclusion of Lots 7 and 8 from the declaration drafts. (Bertel Dep.) Further, Bertel testified that, "based on what I've seen in the plats and then taken with the language that we just reviewed, only those shopping centers which the parties labeled "north" and "south" were intended to be restricted by the declarations, and Lots 7 and 8 were not a part therof. (*Id.*)

Applying the clear, cogent, and convincing standard, Bertel's testimony is hardly equivocal.

Rather, Bertel testified that, in reviewing Declaration 90 prior to its recordation, he could not recall whether he read the Lease or what process he used to review the lots to be encumbered; and he did not know whether Lots 7 and 8 should have been deleted from Declaration 90. (*Id*). However, for purposes of summary judgment, the Court finds that Cushing's testimony supports the allegation that Owner did not want to restrict the property later platted as Lots 7 and 8. Therefore, Owner has presented sufficient evidence that would lead a reasonable juror to find that Owner mistakenly included Lots 7 and 8 in Declaration 90.

Next, turning to mutuality, Lowes claims the absence of *mutual* mistake in that it intended to include Lots 7 and 8 in Declaration 90. In describing mutuality, the Missouri court of appeals in *King v. Factory Direct, Inc.*, 639 S.W.2d 627 (Mo.App. 1982), stated:

> "By the statement that the mistake must be mutual is *not meant that both parties must agree at the* [evidentiary] *hearing that the mistake was in fact made, but that the evidence of the mutuality must relate to the time of the execution of the instrument* and show that the parties then intended to say one thing and by mistake expressed another and different thing." *Id*. at 636 (emphasis in original) (quoting 66 AM.JUR. §23 REFORMATION OF INSTRUMENTS at 551-52) .

First, Owner argues that the inclusion of Lots 7 and 8 was a mutual mistake in that Beekman erroneously believed the lots were included in property to be restricted under the Lease, and the legal description in the Lease does not include Lots 7 and 8. (Doc. #44: 7-8.) Additionally, Owner argues that in drafting Declaration 90, Beekman merely referred to Plat 3, without determining what property consisted of the proposed shopping centers or comparing Plat 3 to the legal description contained in E-2. (Doc. #44: 8-9.) Owner further alleges, given the parties' correspondence during the drafting of Declaration 90, that Beekman intended to restrict only the "south" shopping center, but mistakenly included Lots 7 and 8. (Doc. #44: 9.)

In support of its position, Owner avers that the parties' language referring to the "proposed" shopping centers did not include property later platted as Lots 7 and 8, in that (i) neither party had any knowledge or intent of the property's potential use (Gary Grewe Dep.); and (ii) at the time the Lease was negotiated and signed, there was no discussion of development in that area (Gary Grewe Dep.; Doc. #45 at ¶13). Cushing testified that the physical appearance of the entire Gravois Bluffs property was a "rock pile"; therefore Lowes was made aware, by reference to the proposed concept site plan, of where it would be leasing property and what proposed shopping

centers would be placed around it.[FN20]  (Cushing Dep.)  As a result, both parties knew that the term "proposed shopping centers" referred to two specific shopping centers on the south and east sides.  "There was never any disagreement between the parties, everybody was always in agreement. ∴. We were telling Lowe's that Target was going to go down at the south end of the South Shopping Center, and it was proposed for Wal-Mart to go over on the east side." (Cushing Dep.; Doc. # 45 at 21.)  Lastly, Owner referred to the site plans exchanged by the parties, "showing no proposed shopping center on what is now Lots 7 and 8."  (Doc. # 45 at ¶13, ex. BB.)

> **FN20**.  Cushing testified that the entirety of the property was "basically a rock pile," and the property located west of the Lowes Shopping Center, now platted as Lots 7 and 8, had not yet been divided into lots.  (Cushing Dep.)  Additionally, Gravois Bluffs Boulevard, which now serves as the sole access to Lots 7 and 8, had not been developed.  (*Id.*)  *Contra* Doc. #45 at ¶23 (Owner declares: "the parties knew the location of Gravois Bluffs Boulevard... prior to the execution of the Lease.").

In light of Owner's argument, and after reviewing the proposed site plan exchanged by the parties prior to the Lease; even assuming *arguendo* that Lowes understood the terms "south" and/or "adjacent" (*supra* note 10) to encompass only that legally described "south" shopping center in Exhibit E-2, the Court does not find that the parties objectively intended for "proposed shopping centers" not to include Lots 7 and 8.

Afterall, the Lease was executed during a time when (i) the property had not yet been platted or divided into separate lots, *see, e.g.*, Docs. # 30-3 & 45 at ¶95; Gravois Bluffs Plat One, recorded Dec. 9, 1999; (ii) the property now comprising Lots 7 and 8 was a large tract located southwest of the Lowes Shopping Center (Doc. #45 ex. BB); and (iii) it would not have been unreasonable for Lowes to believe that the property could potentially be used for retail development (*infra*).  Further, with regard to the property east of Highway 141, which the parties stipulate was intended and agreed to be restricted in its entirety; at the time the Lease was executed, (i) the parties had not agreed that it would be used entirely for retail development; and (ii) the site plan exchanged between the parties did not illustrate proposed retail development as to its entirety.  (Doc. #45 ex. BB.)  With that in mind, the evidence does not amount to clear and convincing that the similarly-situated property, later platted as Lots 7 and 8, was necessarily excluded from the "proposed shopping centers."

Additionally in that regard, during the Lease negotiation and execution, Lowes received information pertaining to the potential for retail development on what became Lots 7 and 8. Specifically, Gary Grewe testified that the original concept plan called for retail development on the east side of McCarthy, what was later platted as Lots 5 and 6; and business park, residential, or possibly retail on the property west of McCarthy, later platted as Lots 7 and 8.[FN21] (Gary Grewe Dep.; Docs. #30-3 & 45 at 23.) Additionally, before the Lease negotiation, Lowes received site plans illustrating the potential for development on property inclusive of Lots 7 and 8. (G. Grewe Dep.; Cushing Dep.; Docs. ##30-3 & 45 at ¶30; Doc. #45 ex. BB.)

> **FN21**. Although Owner alleges that "it never thought that there would be a retail development on Lot 7" (Doc. #45 at ¶111), the evidence establishes that it considered using, and would have liked to use, Lots 7 and 8 for retail development. (G.J. Grewe Dep.) However, at the time the Lease was entered into, retail development was an unlikely proposition. (Gary Grewe Dep.; G.J. Grewe Dep.)

Even assuming neither party knew or intended, during Lease negotiations, that the property later platted as Lots 7 and 8 would *necessarily* be used for retail development; such a finding does not preclude this property from what the parties termed the "proposed" shopping centers. Given Lowes' actual knowledge of the surrounding property's potential for retail development, coupled with Owner's claim that all of the east side property was included in the "proposed shopping center"[FN22]; Owner has not proven Lowes' mistake to the clear and convincing standard.

> **FN22**. With regard to a portion of the east side property upon which restrictions were intended to be, and were in fact, recorded; Gary testified that, at the time the Lease was negotiated, (i) he did not consider that property to be a part of the Gravois Bluffs development; and (ii) he did not know for what purpose it would ultimately be used. (Gary Grewe Dep.; *see also supra* note 21.) However, Gary later testified that retail use was planned for the entire east side. (Gary Grewe Dep.)

As its next argument, Owner claims that Lots 7 and 8 were not a part of property which "abutted"[FN23] Highway 141, and therefore could not have been intended as part of the "Proposed Shopping Centers Abutting Highway 141." (Doc. #45 at ¶97.)

> **FN23**. The term "abut" was not defined in the parties' Lease. The Court construes "abut" to mean to "join at a border or boundary; to share a common boundary with." (Black's Law Dictionary 11 (8th ed. 2004).)

In light of the whole record, the evidence put forth by Owner does not amount to clear, cogent, and convincing, that the disputed property did not "abut" Highway 141 at the time the parties entered into the Lease. (*See* Gary Grewe Dep.) Further, the evidence demonstrates that, at the time the Lease was negotiated, the property did in fact abut Highway 141. (Doc. #30-3 at ¶96-97; Cushing Dep.; Gravois Bluffs Plat One 768-69.) Point denied.

In response to Owner's arguments, Lowes alleges that, during the Lease negotiation and execution, it intended to restrict property inclusive of Lots 7 and 8. (Doc. #30-2: 21.) This argument is supported by the record. Beekman drafted Declaration 90 and included Lots 7 and 8. Although Owner asserts that Beekman had no basis for including Lots 7 and 8 in Declaration 90, it has not presented sufficient evidence to challenge each of Lowes' witnesses who testified as to its intent to restrict Lots 7 and 8, and/or all of Owner's property (Doc. #30-3 at ¶21); whose testimony is supported by Lowes policy to restrict as much as possible (Doc. #30-3 at ¶20; Smithey Dep.; Beekman Dep.)[FN24] Lastly, although Owner alleges that it did not review the legal description in the declaration's drafts, there is no evidence to suggest that Lowes' representatives (whom Beekman copied in each exchange) failed to do the same.

> **FN24**. Beekman's testimony that he intended to restrict Lots 7 and 8 because of the potential for retail development on that property is further supported by the parties' stipulation that Beekman determined Lots 5, 6, 7 and 8 all obtained their main access to Highway 141 from Gravois Bluffs Boulevard. (Docs. ##30-3 & 45 at ¶60.)

Thereupon, the Court finds that Owner has not sufficiently established the parties' mutuality in the alleged mistake; therefore, summary judgment is proper. *See, e.g.*, *King*, 639 S.W.2d at 636 ("The mistake may be as to the contents of the writing or as to the effect of the instrument, but the mistake must be of both parties in regard to the same subject matter."); *In re Leo Joseph Callier*, 251 B.R. 850, 854 (D.Mo. 2000).

## OWNER'S MOTION FOR SUMMARY JUDGMENT

In that the Court has ruled in favor of Lowes on its motion for summary judgment, while taking the evidence in the light most favorable to Owner; the Court need not repeat the analysis. The Court therefore adopts the preceding analysis, and **HEREBY DENIES** Owner's motion for summary judgment. Given the clear, cogent, and convincing standard; Owner has not sufficiently

proven (i) a pre-existing agreement or (ii) mutual mistake. Although we might surmise that there was a pre-existing agreement to include only that property legally described in Exhibit E-2, "surmises do not meet the full measure of the law, which requires the proof to be cogent and convincing." *Dougherty*, 102 S.W. at 110; *accord, e.g.*, *Allan v. Allan*, 364 S.W.2d 578 (Mo. 1963):

> In order to prevail on the issue of reformation it is necessary to show that the mistake was mutual, i. e., common to both parties. In that connection we should perhaps state that we are convinced that there was an agreement between defendant and his parents that they should have the right to occupy the farm as a home as long as either lived. However, it does not appear to have been agreed that that provision would be written into the deed. No witness testified that there was any agreement or understanding that the grantors would reserve a life estate in the deed. Moreover, it clearly appears that defendant did not intend that the deed specify that his parents reserved a life estate. He did not instruct Mr. Foulke to place that provision in the deed and explained that it was not specified therein 'because my father and I have always done just exactly what we told one another we would do.' Since there was no mutual mistake on the part of respondents in regard to the provisions of the deed their claim for relief in the nature of reformation must fail. *Id.* at 581.

As a final note, although generally restrictive covenants should be construed in favor of the free use of property; here, the clear, cogent, and convincing standard leaves precious room for conflicting policy. *See Lake Saint Louis*, 746 S.W.2d at 442 (Liberal construction of restrictive covenants "should never be applied in a manner that would defeat the plain and obvious purpose and intent of the restriction.") (citing *Greenberg v. Koslow*, 475 S.W.2d 434, 436 (Mo.App. 1971) and *Weiss v. Fayant*, 606 S.W.2d 440, 442 (Mo.App.1980)).

For the reasons stated herein, in assessing all of the evidence, and reasonable inferences to be drawn therefrom, the Court finds that Owner has not proven, by clear, cogent, and convincing evidence, that the parties' contract does not accurately reflect a pre-existing agreement by reason of their mutual mistake.[FN25]

Accordingly, the Court holds that Lowes' motion for summary judgment (Doc. # 30-1) be **GRANTED** .

The Court further holds that Owner's motion for summary judgment (Doc. # 31) be **DENIED**.

**FN25**.  Missouri courts have allowed reformation only in those cases where mutual mistake was proven to be clear, cogent, and convincing.  *See, e.g.*, *Kopff v. Economy Radiator Service*, 838 S.W.2d 449, 452-54 (Mo.App. 1992); *Cox*, 725 S.W.2d at 882; *Niemeyer*, 515 S.W.2d at 66.

The *Elton* Court, 123 S.W.3d 205, affirmed the trial court's reformation of a deed where "[c]lear, cogent and convincing evidence was presented to support a finding that the parties intended and believed that the property measured by [seller] and described in the reformed deed was the property to be conveyed."  *Id*. at 212.  Specifically, both buyer and seller testified that seller agreed to sell and buyer agreed to purchase approximately two acres of land.  *Id*.  Further, the evidence demonstrated that (i) seller measured and determined the land to be conveyed, (ii) buyer improved and maintained the same land as his own , and (iii) seller continued to farm the land surrounding the two-acre lot as its own.  *Id*.  Additionally, the reviewing court found that clear, cogent, and convincing evidence was presented to support a finding that a mutual mistake was made in the original legal description, in that it did not describe the land measured by seller.  *Id*.

Notably, the record revealed that seller measured and conveyed certain real property by a deed which legally described the property.  *Elton*, 123 S.W.3d at 208-09.  After the property was conveyed, seller ordered a survey of the lot which identified a discrepancy between the legal description contained in the deed and the boundary lines established by seller.  *Id*. at 209.  Although the mistake in measuring the land was that of seller, the court ruled that "the measuring or marking of the land correctly reflected the parties' intent, and the mistake constituted the errant legal description in the deed of the land measured and marked.  ∴.  The source of the mistake, however, is not relevant in a suit for reformation; instead the fact of the mistake empowers the court of equity to act."  *Id*. at 212 (citing *St. Louis County Nat'l Bank v. Maryland Cas. Co.*, 564 S.W.2d 920, 926 (Mo.App. 1978)).  In that the original deed described the property that neither party intended, reformation was proper.  *Elton*, 123 S.W.3d at 213.

The *Hoffman* court, 875 S.W.2d 948, affirmed the trial court's summary judgment grant of reformation, where the deed contained a legal description of the larger of two contiguous parcels, but did not contain the legal description of the smaller parcel.  *Id*. at 949.  In that case, two partners who had previously distributed property to a trust (deed-1), hired an accountant to compile values and equally divide their property; after which each randomly chose a package.  *Id*. at 949-50.  The accountant testified that the value assigned to property located at 1000 South 9th Street included both the value of the large and small parcels.  *Id*. at 950.  Further, the scrivenor of the subsequent deed (deed-2) testified he was unaware that the property was made up of two parcels and therefore included only the legal description of the large tract.  *Id*.  The parties stipulated that; when the two properties were originally distributed in deed-1, under the common address later called out in deed-2; they both believed they were conveying two parcels.  *Id*.  Defendant testified extensively that the properties should have been treated differently, and that although he intended to distribute both properties in deed-1, he was operating under a mistaken belief as to the ownership of the smaller property, and it should not therefore have been included therein.  *Id*. at 951-52.  After reviewing the evidence before it, the trial court found (i) deed-1 was the prior agreement, (ii) the parties intended to convey both parcels, and (iii) there was a

mutual mistake of fact in the preparation and execution of deed-2. Therefore, deed-2 was properly reformed to include the legal description of both parcels. *Hoffman*, 875 S.W.2d at 953.

The *King* court, 639 S.W.2d 627, affirmed the trial court's reformation of a deed, where two parties entered into a one-year lease, prepared by appellant-buyer, with an option to buy. *Id*. at 628. The option described the real property generally, and referenced a legal description contained in the lease. *Id*. at 628-29. Although the lease did not contain a legal description, respondent-seller thereafter delivered a survey of the land (the Evans Survey) to buyer. *Id*. at 629. Sometime thereafter, buyer exercised the purchase option; at which time seller ordered another survey of the property (the McClarnon Survey), which found approximately 51.9 frontage feet on the adjacent road, as compared to 100 frontage feet identified on the preceding Evans Survey. *Id*. Seller explained that the additional property resulted from its squaring off of the property with the disputed tract. *Id*.

The real estate sales contract was prepared by seller's attorney, and described the property by reference to the McClarnon survey which was attached thereto. *King*, 639 S.W.2d at 629. Additionally the contract contained the footage of the tract as " '.... said property having a frontage of one hundred feet (100') on Highway 69, and fifty feet (50'), more or less, on [the adjacent road]....' " *Id*. After the sales contract was executed, the preparer of the warranty deed requested a property survey and contract from seller. *Id*. Seller testified that, at the time, it did not have either document; so it provided the preparer with the Evans Survey on instructions that, "although the Evans Survey showed more land than was being sold to [buyer], the Evans Survey could be used to get the title report started." *Id*. Two days later, seller delivered the McClarnon Survey and the sales contract to the preparer, but failed to retrieve the Evans Survey. *Id*. The preparer testified that, through office error, the Evans Survey and not the McClarnon Survey was used to describe the property, and the warranty deed mistakenly contained more land than the real estate contract. *Id*. In addition to the warranty deed, the Evans legal description was used in all other documents, i.e. the deed of trust. *Id*. at 629-30.

The reviewing court found that the evidence supported the trial court's findings that (i) seller intended to convey, and buyer intended to receive, the tract described within the sales agreement, *King*, 639 S.W.2d at 632; (ii) plaintiff showed by clear and convincing evidence that a mutual mistake was made in the warranty deed legal description which contained more land than the legal description attached to the sales agreement, *id*. at 631, 633; and (iii) that seller was entitled to reformation of the legal description in the warranty deed, *id*. at 631, 633.

Dated this 5th day of December, 2007.

**SENIOR UNITED STATES DISTRICT JUDGE**